We will move on to the next appeal. It's Wendy Sharp v. St. Jude Medical. Jane Vinson is here for Sharp. Andrew Tauber is here for St. Jude. And Ms. Vinson, are you ready to proceed? I am. You may. Good morning and may it please the court. My name is Jane Vinson and I represent the plaintiff appellant in this case. This court's recent opinion in Godelia v. Doe 881 F. 3rd 1309 is dispositive in this case. While Godelia was not briefed in the trial court and the district court did not apply it in its order, Godelia is the controlling law in this case. Under allegations virtually identical to this case, this court in Godelia held, one, that a state law manufacturing defect claim, and Georgia and Florida law are materially the same on this, does not have to identify the specific defect. Two, the violations of federal regulations identified in FDA communications sufficiently allege a parallel claim. And three, that a plausible causation nexus existed between various violations and the plaintiff's death. Although these holdings in Godelia control this case, defendants never engage with Godelia in their briefing before this court. In 50 pages of briefing, defendants only mention Godelia three times. Each time is merely a passing reference and two of those are in footnotes. I realize there is a question in this case about whether Ms. Sharpe has alleged state law defect claims, but because those claims live or die based on the preemption issue, I'd like to start with preemption if that suits the court. So, well, hold on. This is Judge Newsom. Sure. I don't want to interrupt the flow too badly or cause you to reshuffle your pages, but it seems to me that just logically, you ought to go in the opposite order. You've got to prove a state law claim first, and then if you've got one of those, then we'll ask whether it's preempted. But I don't really think they live or die on preemption. They might die on preemption, but they don't live on preemption. They've got to live on their own. Okay. I'd be happy to address that claim first. Great. As far as the state law claim goes, the district court simply got the law wrong under Georgia law for a manufacturing defect claim. The district court incorrectly held that Ms. Sharpe only alleged a malfunction of the implantable cardiac device and not a defect. First, Ms. Sharpe clearly alleged more than an isolated malfunction. Her complaint alleges systematic failures of the RIATA lead across hundreds of patients. For example, in paragraph 122, she alleges that defendant's internal audit was looking at insulation problems in 2006. In paragraph 120, she alleges that doctors were reporting abnormal rates of RIATA lead failure as early as 2006. And in paragraph 171, she alleges that one-third of RIATA deaths were lead-related, but that less than 8% of the competitors' deaths were lead-related. But second, Georgia law also doesn't require a plaintiff to prove a specific defect. Like the Florida law this court applied in Godelia, Georgia law recognizes a defect where the evidence shows that, quote, the device did not operate as intended. And that is from a Georgia Court of Appeals opinion, Williams v. American Medical Systems, 548 Southeast 2nd, 371. And the defendants are wrong that Ms. Sharpe was required to prove her husband's leads were different than other leads. Under Georgia law, it is enough that the complaint alleges, quote, a departure from the product's design specifications. And that is in Fletcher v. Water Applications, 773 Southeast 2nd, 859, a Georgia Court of Appeals opinion from 2015. As for the district court's analysis that Ms. Sharpe did not allege causation, I'm honestly at a loss for how it reached that conclusion. As detailed in the complaint and the briefing, Mr. Sharpe's device short-circuited because of insulation abrasion that caused the wire to be exposed. And Ms. Sharpe alleges in her complaint that that insulation abrasion was caused by manufacturing defects in how the defendants applied the insulation on the leads. And as Ms. Sharpe's complaint... Let me ask you this. Let me ask you this. This is Judge Newsom. Maybe I'm just misunderstanding, but as I read your briefs, you essentially had sort of two pathways for identifying the defect in the first place. First, you emphasized this recall. And second, you emphasized the failure of the device to meet certain requirements under the PMA or these... It's another acronym that I've now forgotten, GMPC, perhaps. Correct. And so, will you talk to me about the defect first, or rather the recall? I mean, it strikes me the recall was for a design defect. I don't really know how that advances your cause toward a manufacturing defect. You are correct that the FDA recall notice does say that it was a design defect. But whatever the term the FDA used, the actual communications, the warning letter, and the Form 483 confirm that it's a manufacturing defect. And what I would like to focus on here is the... So, if we look at paragraph 102 in the complaint, the defendants are required when they identify issues in the manufacturing process to create what are called CAPAs, which is an acronym because this field is full of acronyms. And if you look down in that paragraph 120... I'm sorry, 102, the CAPAs are identified, or the process improvement records, they identify by year. So, you have 09, 005. And you go down, and if you look at the last several there, you have 2002-04, 2003-06, 2004-06, et cetera, as it goes up. And what you can see if you actually look at the violations and the problems with the RIATA lead, you can see there at the very bottom, it was missing a weld on the lead. You have the coating abrasion is coming off. You have an insufficient crimp. And as you go up, there's incorrection conduction paths. They've swapped labels. They're missing crimps again. There's a fracture in the inner coil shaft. So, all of those, whatever the FDA language they used, it's clear from the allegations, which are based on defendants' own documents and FDA communications, that the problems were in the manufacturing process. This is Judge Anderson speaking. Now, you're talking about the complaint, but is the complaint referring to the recall? I mean, we do discuss the recall in the complaint. Well, my question is, you're suggesting, though, that although the recall said that it was a design defect that it was recalling on the basis of, but are you suggesting that the are you suggesting that that indicated manufacturing defects as well as design defects? Correct. That is what I'm suggesting and I think what the complaint lays out. And importantly, recalls can be based on both manufacturing defects and design defects. And so, you know, that the FDA considered, you know, that there was some design defect certainly does not foreclose manufacturing defects as well. And as you suggested there, the actual FDA documents that preceded the recall certainly indicates a manufacturing defect. What are you talking about? Are you talking about the warning, the inspection in 2009? Correct. I'm talking about the 483 that was issued in 2009. And I know that the defendants, you know, make a lot about the fact that that came, you know, five years after or four years after Mr. Sharpe's device was implanted. But again, a review of the complaint shows that those allegations are actually, I mean, that form 483 in 2009 was based on an inspection that went back all the way to 2002 and looked at the defendant's records and identified these problems as early as 2002, again in 2003, again in 2004, and again in 2005. And so, just because the letter was issued or the form was issued in 2009 doesn't foreclose, you know, and in fact, the communications themselves identify these problems in the manufacturing process well before Mr. Sharpe's device was implanted. Okay. Let me get one more thing straight. I was confused a minute ago. The form 483 is related to the 2009 inspection, not the recall in 2011, correct? Correct. Okay. So, it refers to manufacturing defects. Does the recall in 2011 also refer to, and the substance of it, refer to manufacturing defects? The, I mean, the notice itself is very short that the FDA provides. But they, the, I mean, the 2011, there was another inspection in 2011, and the FDA found that basically it was a continuation of a lot of the same problems that they had identified in 2009. And in fact, part of the 2011 warning letter was that they hadn't sufficiently addressed these problems in the manufacturing process that they had been called out on in 2009. And so, again, I think that the 2012 recall was a combination of the failure to correct these manufacturing defects and perhaps design defects, although those are not been able to see, you know, and access through publicly available sources. All right. Thank you, Ms. Vincent. You've reserved some time. And we'll hear from Mr. Tauber. Hello? Hello? Can the court hear me? Yes. Mr. Tauber? Yes. Hi. Sorry. I wasn't sure you expected me to start. Yes. Andrew Tauber on behalf of defendants' appellees. Judge Newsom's question at the early part of plaintiff's argument, I think, starts us in the right place. Namely, whether or not this complaint adequately states a cause of action under Georgia law. And the fact is, it does not adequately allege a fashion defect under Georgia law. Under Georgia law, as Ms. Vincent said, the plaintiff must allege that the lead deviated from its intended design. But with respect to a Class 3 medical device, such as the lead at issue here, the device's intended design is defined by the device's PMA application that had been approved by the FDA. Here, plaintiffs admit in the complaint that the supposed PMA requirements that she alleges were violated, i.e., the design specifications from which the lead deviated, did not exist when Mr. Sharp's lead was manufactured. According to the allegations of the complaint, the PMA specifications, which defined the design specifications that were purportedly violated, did not exist until 2005 at the earliest. Mr. Sharp's lead was manufactured in 2004 at the latest. So those specifications upon which the complaint rests simply are not applicable to Mr. Sharp's lead, or the plaintiff's own admission. And those are the only purported design specifications... This is Judge Anderson talking. Where do you assert that the plaintiff admitted that? Well, I should say tacitly admitted, insofar as, in the complaint, she alleges that the four... Give me the paragraph number. Give me the paragraph number. If you give me a moment, Ron, I'll try to find that citation. Let's see. That Mr. Sharp received the Leotta lead in 2004 is set forth at paragraph 35 of the complaint. And I apologize. I just don't have that page citation. I think I know which one you're talking about. So proceed. Okay. Thank you, Your Honor. I can provide the court that citation if that letter is necessary. It looks like it might be 143 to 149. I think that's correct. Thank you, Your Honor, for helping me out there. I appreciate it. So again, under Georgia law, plaintiffs must allege a deviation from a design specification. The only design specifications that she has alleged exist are ones that, by tacit admission, did not exist at the time of application to the device. That alone is sufficient to hold this claim insufficient under Georgia law and Twombly and Iqbal. Now, she points to alleged CGMP violations that were purportedly found around 2009, five years after the manufacture of the device. But alleged CGMP violations cannot cure the fundamental pleading flaw of having failed to allege design specifications. Not only were these purported violations five years after the manufacture of the device in question, but it is only the PMA that imposes design specifications on the device. CGMPs do not. CGMPs are about process and record keeping, not about the design. And just I want to be clear that our argument is not that the CGMPs are not device-specific, but they're overly vague. They're not imposing design specifications, they're imposing process specifications. And Ms. Vincent was simply wrong in mischaracterizing the record when she said that the Form 483 confirmed that there were manufacturing key sets. The FDA said nothing of the sort in that document. It did identify what it perceived to be record keeping and process violations, but never in that form or anywhere else did the FDA suggest that the device deviated from the approved PMA specifications. It did not do so in the Form 43, and as Judge Newsom correctly noted in the recall notice on which plaintiff relies, it says quite the opposite. It says the problem with the devices that led to the general problems that Ms. Vincent identified was device design. She said, well, we should ignore what the FDA says, but she can't have it both ways. Her entire claim rests on FDA actions, the recall and the Form 483. She can't, on the one hand, rely on what the FDA is doing and then disavow what the FDA did when it's not convenient. Her claim simply is not, the manufacturing defect claim simply is not plausible. This is Judge Anderson again. I am gathering that your argument hinges entirely on this argument that there are no alleged PMAs before 2005, and without any alleged PMAs, there can be no manufacturing defect, at least one that is a parallel claim, so that your argument rests entirely upon our agreeing with you that everything after paragraph 143 refers only to PMAs after 2005 or after, and there is no reasonable inference that there is any PMA, for example, with respect to consistent diameter of insulation before 2005. Am I correct that your argument hinges entirely upon that assumption? Well, this argument with respect to the adequacy of the allegations with respect to the existence of a manufacturing defect on Georgia law hinges on that, Your Honor. It's certainly not our only argument. In Willicke-Gables, the court held that the manufacturing defect claim should be dismissed, and I quote, because, well, because the plaintiff had failed to adequately allege, and now I quote, specific PMA requirements that have been violated. Ms. Vincent tries to wrap herself in the good deal yet, but she can't ignore Willicke-Gables, and if anything, it is Willicke-Gables that controls here, not good deal yet. Willicke-Gables is the earlier decision, and it expressly states that the plaintiff must allege, quote, specific PMA requirements have been violated, and here, though plaintiff alleges the existence of certain requirements, she concedes that they did not apply in 2004, which is the relevant time period here, and Your Honor, again, speak to this. This is Judge Wilson, but in order to survive the motion to dismiss, all she has to do is to demonstrate a plausible inference that the device that this Rialto lead suffered from these defects. She doesn't have to prove her case at this stage, and we have found similar, very similar allegations before to be sufficient to state a claim, and we did so in 2004. She doesn't have to prove her case. She just needs to demonstrate a plausible inference that the device suffered from these defects, relying upon the FDA recall and report 483. Two things, Your Honor. The recall doesn't make her claim plausible. The recall notice makes her claim implausible. The FDA specifically determined that the reason for the recall was device design, not manufacturing defect, and the 483 says nothing about deviation from design. There's nothing in this record to support the conclusion or assertion of a defect. You can make that argument later, but when we compare this case to similar cases that we've decided before, all she needs to do is to plausibly demonstrate that the device suffered from the design defects. No, from a manufacturing defect, Your Honor, and that she has not done. Design or manufacturing defects. No, it's only manufacturing. She's only alleged to manufacturing defects. Only manufacturing. No design claim here. This is Judge Anderson speaking. I think that Judge Wilson is correct, is he not, that in Godelia, I didn't see any indication of a violation of a PMA. Am I not correct? I think there was both allegations of PMA and EG&P violations. The larger point, Your Honor. You're talking fast and I can't hear you. I saw no reference in the opinion to suggest there was a and if I am, point me to where it says something that suggests there was a PMA violation there. No, I believe you are correct, Your Honor, but if Godelia is understood as holding that a plaintiff need not allege, need not plead facts that plausibly suggest the existence of a PMA requirement that was then violated, that reading of Godelia is in diametric conflict with what this court held earlier in Willicki-Gables, when this court specifically held that in order to adequately allege the claim, the plaintiff must point to, and I'm quoting once again, specific PMA requirements that have been violated. Now, if this court thinks that it is, that Godelia would lead to reversal, but Willicki-Gables leads to affirmance, and I think it does, there's a conflict between the two and the court should go en face, but I don't think that's necessary because here, this case is clearly distinguishable on the facts from Godelia. First of all, Godelia pretty much assumed that a defect had been sufficiently alleged and then focused on whether the plaintiff had adequately alleged causation. It does not govern whether plaintiff's allegations of a manufacturing defect, as opposed to causation, are sufficient. And Godelia, as I say, is not only legally distinguishable, it's factually distinguishable. In Godelia, the court thought the allegations plausible, but there, the device failed a mere month after the patient received the device, unlike here, where a full decade passed before the device malfunctioned. And in Godelia, the device at issue was an external defibrillator, not an implanted device, and thus was not subject to the harsh conditions inside the body to which Mr. Sharp's device was subject. And the warning letter on which the plaintiff in Godelia relied to show federal violations was based on an inspection only six months after the patient received the device, not five years later as here. And moreover, in Godelia, unlike here, the plaintiff expressly alleged that the violations found six months later existed when the device in question was manufactured. There is no such allegation in the second amended complaint that is operative in this case. So I think even under Godelia, we win, but if this court thinks there's a tension between Godelia's analysis and the circuit's rule, the panel precedent rule, Willicke-Gables takes precedence over Godelia. Let me ask you one more question. I understand that if Willicke holds that you have to have a PMA violated and not one of the more general regulations, which I assume in effect codify the current good practices. If that is true, then this question is moved, but I'm not sure that Willicke is controlling as because of the way it was distinguished in Mink and especially in Mink, but also in Godelia. So I'm going to ask you this question. It seems to me as a matter of common sense that the 2009 inspection and the 2011 recall indicate that this particular device is very susceptible to safety violations, in particular with respect to the lead. Why is that not enough? Because, Your Honor, one cannot infer a manufacturing defect. Specifically, one cannot infer a deviation from the FDA-approved design specifications in the PMA from the mere fact that the lead malfunctioned 10 years after implantation. This is not like the situation in Godelia, where the malfunction was a mere few months after the implantation, nor is it like Mink, where the patient began exhibiting signs of chromium and cobalt soon after the implantation. So even if it were permissible to draw the inferences of defective causation that the Court drew in Godelia and Mink, those same inferences simply are not available here. The Supreme Court has been clear in Quambly and Iqbal that the plaintiff must see facts that raise the right to relief to a plausible level. But here, a court reviewing the adequacy of the complaint uses its common sense and its judicial experience. Here, plaintiffs' claims are rendered implausible based on judicial experience and common sense. As we pointed to the Court in our briefing, another federal court, the Pincinello Court, determined after full discovery that three of the four purported PMA requirements simply do not exist at all. And plaintiff here has not alleged any fact to support her conclusionary assertion contrary to what the Pincinello Court found, that these PMA requirements were applicable at the time. So this is an implausible claim that does not satisfy Quambly and Iqbal, Your Honor. All right. Thank you, Mr. Tauber. And Ms. Vincent, you have reserved some time. Yes. Thank you. So I want to start with the intended design issue that was raised. And I have a couple of points on that. First of all, you know, the idea that the product was designed, presumably, certainly, St. Jude did not design the lead to Short Circuit in Mr. Sharf's heart. But I would also direct the Court to paragraphs 204 and 205 of the complaint, where plaintiff specifically alleges that it had an impurity and imperfection that was a deviation from the quality manufacturing standards for the device, leaving the device in a defective condition. And again, in 2005, that those defects specifically included inconsistent insulation diameters. And so, I think that... Can I just ask you a quick question? So in that allegation, what design specification are you alleging, or from what design specification are you alleging a deviation? Prescribed when? Sure. So I think the best reference here is, if you look at the chart in our reply brief, at pages 8 and 9, we go through pretty systematically what the FDA-approved design was, consistent insulation diameters, lubrication, curing, and sterilizing. We identify what St. Jude's violation was, the defects that that caused. When did those come into effect? When did they come into effect? Because at least my notes reflect those in your chart. The specifications in your chart came into effect in 2005. I don't believe there's anything in the chart or those paragraphs that suggest those came into effect in 2005. Well, I mean, our own digging reflects that those specifications came into effect in 2005. So I would honestly respectfully disagree with that characterization. Is it your... So I'm sorry. I didn't mean to talk over you. What did you say? I just... You know, I respectfully disagree with that characterization as well as... Is there an allegation that there is a PMA or other design specification that predates the implantation of the device from which you allege there was a deviation? Absolutely. Where in your plan do you allege a pre-2004 design specification? Paragraph 65. The PMA actually goes all the way back to 1995 when the device was first approved. They had to submit a PMA, and then over the next... You know, it wasn't released to the public until 2002. But there were... You know, the original PMA, again, was issued in 1995, and there were a number of supplements that happened between 1995 and 2002. And again, more supplements that happened between 2002 and 2005. And that's laid out... You know, that original PMA is identified and alleged in paragraph 65. And so Mr. Talbert was just wrong on the 2005. And as was pointed out in his rebuttal, you know, to the extent his claim lives or dies, you know, based on that 2005 date, he's just wrong. Okay, we'll figure it out. And just off the... Judge Anderson talking. Just off of the cuff, can you tell me the paragraphs you are relying upon that relevant PMAs existed prior to 2004? So that paragraph was 65, identifying the first PMA that was issued for the RIATA lead. And then paragraphs 144, 147, 148, and 149 identify the specific violate... You know, the specific requirement and violation of those. And I think plaintiff has certainly met the standard to plausibly allege a violation of those and the resulting defect. And those in 144 and 147, 148, and 149, it is your position that it is not clear that those are post-2005? Yeah. I mean, we believe that... I mean, you know, I think what is implausible in this case is that when the PMA was originally approved, the defendants were allowed to manufacture the lead with any insulation thickness they wanted, with any lubrication that they wanted, and using whatever curing process they wanted. You know, the consensus in this field is that insulation abrasion causes catastrophic failure in these devices. And, you know, I think plaintiff has plausibly alleged that those specifications were in the original PMA. So, this is Judge Newsom, just to kind of put a... sort of to put a bow on it. So, it sounds like, in answer to Judge Anderson's question, in the paragraphs 143 to 149, you don't really deny that the specifications identified there post-date the implantation in 2004, but you say, if you look back at 65, paragraph 65, in essence, that's the original PMA, and it sort of anticipated all of the specifications that were thereafter added in the paragraphs you identify... or the specifications you identify in paragraph 143 to 149. I would... the only disagreement I would have with that is that we only rely on those post-2005 for the subsequent violations. Those... that... those following paragraphs are not dependent upon that first allegation. There were allegations about failure to warm and other claims that are not raised in this, and that paragraph provides context, but there's nothing in those subsequent paragraphs that ties them only to those supplements that were filed after 2005. I think we have your argument, counsel. Thank you, Ms. Benson. Thank you. And Mr. Tauber.